**PAUL HARRIS STORES, INC., Appellant,**

v.

**MABEL L. SALTER REALTY TRUST, Appellee.**

**In re PAUL HARRIS STORES, INC., Paul Harris of Virginia, Inc., Paul Harris Stores, S.D., Inc., Debtors.**

**Bankruptcy No. IP 91–2100–RLB–11.**

**No. IP 91–1286–C.**

United States District Court
S.D. Indiana,
Indianapolis Division.

Nov. 3, 1992.

James M. Carr, Cherry Cox, Baker & Daniels, Indianapolis, IN, for Paul Harris Stores.

James A. Knauer, Jay P. Kennedy, Kroger Gardis & Regas, Indianapolis, IN, for Mabel L. Salter Realty Trust.

David L. Pollack, Jeffrey Meyers, Rosenwald & Pollack, Philadelphia, PA, for Rouse Co. Affiliates and Kravco Co., Amicus Curiae.

## ORDER AND OPINION

McKINNEY, District Judge.

Debtor Paul Harris Stores, Inc. ("Harris") has appealed the bankruptcy court's "Entry on Motion for Order Directing Payment of Administrative Expense," dated November 5, 1991 ("Entry"). In that entry, the court ordered Harris to pay the Mabel L. Salter Realty Trust ("Salter")

$63,959.39 in post-petition rent for the period from April 1, 1991 to August 19, 1991, for a store site in Boston, Massachusetts. Briefing is complete,[1] and jurisdiction is proper under 28 U.S.C. § 158, so the matter is ready for resolution.

## I. FACTS AND PROCEDURAL BACKGROUND [2]

The relevant facts, as found by the bankruptcy court, are not disputed by the parties. Harris, a company that sells women's clothing and accessories at various locations across the country, filed for Chapter 11 bankruptcy on February 27, 1991. Until shortly after this date, Harris occupied a store site at 359 Boylston Street in Boston, Massachusetts, which it rented from Salter pursuant to a 1986 lease. Harris paid rent through March 31, 1991.

Harris, acting as debtor-in-possession, closed the Boylston Street store on March 23, 1991, and told Salter representatives that it planned to reject the unexpired lease pursuant to 11 U.S.C. § 365(a).[3] Harris physically surrendered the site on April 19, 1991, telling Salter that a Harris representative would soon contact it to discuss disposition and potential claims under the lease. Harris, after receiving two extensions of time, moved for bankruptcy court approval of the rejection on July 10, 1991.[4] Salter objected, so the motion was set for an August 19, 1991 hearing. On that date, the court approved the rejection.

Meanwhile, Salter moved, pursuant to 11 U.S.C. § 365(b)(3),[5] for an order directing Harris to pay rent for the period between March 31, 1990 and August 19, 1991, according to terms of the parties' lease. The bankruptcy court granted this motion on November 5, 1991, holding (1) that Harris owed rent as an administrative expense for the entire period preceding court approval of the lease rejection on August 19, 1991; (2) that Harris must pay the amount due under the lease, without regard to 11 U.S.C. § 503, which allows administrative priority only for expenses shown to be "actual" and "necessary"; and (3) that Salter was entitled to immediate payment, without waiting in line to be paid on a pro rata basis with other administrative claimants. Harris has appealed the first two parts of this decision.

## II. DISCUSSION

Harris's appeal presents two legal issues, both of which this Court reviews *de novo*. *Excalibur Automobile Corp. v. Robinson (Matter of Excalibur Automobile Corp.)*, 859 F.2d 454, 457 n. 3 (7th Cir.1988); *In re Longardner & Assocs.*, 855 F.2d 455, 459 (7th Cir.1988). First, when is the rejection of a lease under 11 U.S.C. § 365(a) deemed effective, so that a debtor is no longer obligated to pay post-petition rent? Second, under 11 U.S.C. § 365(d)(3), may the lessor recover post-petition, pre-rejection rent in the amount specified in the lease, or

1. Pursuant to a February 14, 1992 order, the Rouse Company Affiliates and Kravco Company filed a joint *amicus curiae* brief on the issues presented by Harris's appeal. The Court has read and considered this brief in its deliberations.

2. In reviewing a decision of the bankruptcy court, a district court "is constrained to accept the bankruptcy court's findings of facts unless they are clearly erroneous." *Excalibur Automobile Corp. v. Robinson (Matter of Excalibur Automobile Corp.)*, 859 F.2d 454, 457 n. 3 (7th Cir. 1988); *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 459 (7th Cir.1988), *cert. denied*, 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989).

3. Section 365(a) states, in pertinent part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." A debtor-in-

possession has the same power, pursuant to 11 U.S.C. § 1107.

4. Section 365(d)(4) limits a debtor-in-possession to sixty days in which to reject or assume a lease, unless the bankruptcy court enlarges this time upon motion. Harris moved for such an enlargement on February 28, 1991, and on March 22, 1991 was granted a first extension until June 27, 1991. On June 10, 1991, Harris moved for more time, and on June 20, 1991 the court extended the period until a hearing on objections to the extension could be conducted. On July 9, 1991, the court set such a hearing for August 1, 1991. Harris moved to reject the Boylston Street lease the next day.

5. Section 365(d)(3) requires a debtor-in-possession to "timely perform all the obligations of the debtor ... until such lease is assumed or rejected."

does 11 U.S.C. § 503(b) require it to prove that such an amount provides "actual" and "necessary" benefit to the bankruptcy estate? No court of appeals, including that for the Seventh Circuit, has addressed either question.

### A. Effective Date of Rejection

Section 365 of the Bankruptcy Code grants a debtor-in-possession power to reject (or assume) any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). This power is fairly broad, but it has limits, especially where non-residential real property is concerned. Initially, any rejection or assumption decision is subject to bankruptcy court approval. *Id.* In addition, the decision to reject or assume must be made within sixty days of the filing of the bankruptcy petition, unless the court grants additional time, or it is automatically deemed rejected. *Id.* § 365(d)(4). Finally, a rejecting party must timely perform all obligations of the debtor, including payment of rent, until the lease is effectively rejected. *Id.* § 365(d)(3).

 The statute, despite its relative specificity, fails to make clear just when is a lease rejection deemed effective, so as to free a debtor-in-possession from paying post-petition rent (or performing other debtor obligations) under § 365(d)(3). The parties advance two possible answers. Harris contends that the rejection of a lease is fully effective from the time the debtor-in-possession first indicates to the landlord, clearly and unequivocally, that the lease is being rejected. This indication can come when the debtor files a motion to reject, or earlier when it performs some other unambiguous act, such as writing a letter or surrendering keys to a store site. Salter argues, in contrast, that a lease rejection has no legal effect until it is formally approved by the bankruptcy court, even though such approval will never come until well after a debtor first indicates its intent to reject. Several factors indicate that Salter's argument is the better one.

### 1. *Plain Language of Statute*

Initially, there is the plain language of the statute, which makes rejection of an unexpired lease "subject to the court's approval." 11 U.S.C. § 365(a). Most courts have read this phrase to make court approval a condition precedent to effective lease rejection, *see, e.g., WB Ltd. v. Tobago Bay Trading Co. (In re Tobago Bay Trading Co.),* 142 B.R. 528, 532 (Bankr.N.D.Ga. 1991) (citing cases), and the language would appear to be "meaningless," *In re Worths Stores Corp.,* 130 B.R. 531, 534 (Bankr.E.D.Mo.1991), or as one court has put it, "little more than a rubber stamp," *Swiss Hot Dog Co. v. Vail Village Inn, Inc. (In re Swiss Hot Dog Co.),* 72 B.R. 569, 571 (D.Colo.1987), if a debtor's unilateral act of rejection were given immediate effect.

Harris counters with its own plain language argument, contending that § 365(a) distinguishes between a debtor-in-possession's act of rejection and the court's act of approval, and that this distinction proves that rejection can be effective before a court says it is. Harris is correct that a debtor's act of rejection is distinct from court approval, *see Arizona Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Arizona Appetito's Stores, Inc.),* 893 F.2d 216, 219 (9th Cir.1990), and at least one bankruptcy court, in recently adopting the position espoused by Harris, has hinged its reasoning on this fact. *See In re Joseph C. Spiess Co.,* 145 B.R. 597 (Bankr.N.D.Ill.1992). However, Harris's "two act" argument misses the real question posed in this case. The key concern is not establishing when the debtor-in-possession first acts to reject a lease; rather, it is determining the point at which that act gains legal, binding effect. Section 365(a) contemplates and requires two acts, but *both* are required before "rejection ... can be accomplished." *Arizona Appetito's,* 893 F.2d at 219. Because court approval will always come last, only then will a lease rejection gain effect.

### 2. *Case Law*

Salter's argument is also well-supported in the case law. Ten courts have considered the precise issue raised here, and eight have agreed that a lease rejection is effective only after being approved by the

bankruptcy court. *See Matter of Federated Dep't Stores, Inc.*, 131 B.R. 808, 815–16 (S.D.Ohio 1991); *Maroon v. Four Star Pizza, Inc. (In re Four Star Pizza, Inc.)*, 135 B.R. 498, 501 (Bankr.W.D.Pa.1992); *In re Parklane Hosiery Co., Inc.*, No. 91–B 14149 (JLG) (Bankr.S.D.N.Y. Jan. 10, 1992); *Tobago Bay Trading*, 142 B.R. at 532; *Worths Stores*, 130 B.R. at 533; *In re Virginia Packaging Supply Co., Inc.*, 122 B.R. 491, 493 (Bankr.E.D.Va.1990); *In re Garfinckels, Inc.*, 118 B.R. 154, 154 (Bankr.D.D.C.1990); *In re Revco D.S., Inc.*, 109 B.R. 264, 267–70 (Bankr.N.D.Ohio 1989). *But see Spiess*, 145 B.R. at 599–606; *In re 1 Potato 2, Inc.*, 58 B.R. 752 (Bankr.D.Minn.1986).

In *Revco*, widely considered the seminal case on this issue, the debtor wrote a letter to its sublessor, rejecting its sublease for a warehouse. A month later, the debtor moved for court approval of the rejection, which the court granted in another 20 days. The sublessor then asked for post-petition rent through the date of court approval; the debtor argued that it should pay only through the date of its letter.

The court sided with the sublessor for three general reasons. First, it found the sublessor's position "well supported by case law"—particularly *In re National Oil*, 80 B.R. 525, 526 (Bankr.D.Colo.1987) and *Treat Fitness Center, Inc. v. Rainbow Investment (In re Treat Fitness Center, Inc.)*, 60 B.R. 878 (9th Cir.BAP 1986), both of which held that the court approval requirement is meant to save courts from "attempting to judge the meaning and import of ... conduct and conversations" in determining when a rejection has been made. *Revco*, 109 B.R. at 267–68; *see Treat Fitness*, 60 B.R. at 879; *National Oil*, 80 B.R. at 526; *see also Worths Stores*, 130 B.R. at 534 (order gives "clarity and finality" to rejection). Second, it held that revised Bankruptcy Rules 6006 and 9014, which together give parties involved in proceedings to reject leases the right to notice and hearing, "evidence Congression-al intent to strengthen the role of the court in the assumption/rejection decision making process." *Revco*, 109 B.R. at 268–69 (citing *Swiss Hot Dog*, 72 B.R. at 572). Finally, the court pointed to policy considerations, noting that the debtor's approach could force a lessor to "[r]elet the premises prior to court approval ... and face the risk that the court may not approve," which would lead to a breach of contract suit by the new lessee. *Id.* at 269. *Revco* has been expressly approved or followed by numerous courts. *See, e.g., Federated Stores*, 131 B.R. at 814–15; *Tobago Bay Trading*, 142 B.R. at 532; *Worths Stores*, 130 B.R. at 533; *Virginia Packaging*, 122 B.R. at 493; *Garfinckels*, 118 B.R. at 154.

*Federated Stores*, the only reported district court decision on this precise issue, is in accord. There, the bankruptcy court gave retroactive effect to a lease rejection where the motion for approval had been pending for some time, holding that it was unfair to "compel debtors to pay additional rent caused by a delay over which they had no control." *Federated Stores*, 131 B.R. at 814.[6] The district court reversed. Though acknowledging debtors' general lack of control over the timing of judicial rulings, the court held that this is no reason to penalize lessors:

> [The lessor] had no more control over the delay in issuance of the bankruptcy court's decision than did the debtors. As a general rule, the party seeking relief in any court must bear the risk that the court may not reach a decision as quickly as the party expected or desired. Here, it was the debtors who necessarily sought court approval for rejection of the lease. The Court sees no reason for departing from the general rule in this case.

*Federated Stores*, 131 B.R. at 815.

Harris's argument is not without support. In *In re 1 Potato 2, Inc.*, 58 B.R. 752 (Bankr.D.Minn.1986), the court held that rejection is effective when the debtor com-

---

**6.** The fact setting in *Federated Stores* was somewhat unique. The debtors filed their motion for approval on July 13, 1990, requesting an effective date of October 3, 1990. A hearing was conducted on August 23, 1990, but the bankruptcy court failed to issue any ruling until January 28, 1991. *Federated Stores*, 131 B.R. at 810–11.

municates its intention "in an unequivocal manner," and "manifest[s] an unconditional and unambiguous decision" not to assume the lease. *1 Potato*, 58 B.R. at 754–55. On close examination, however, *1 Potato* proves unpersuasive. The court there relied upon two cases—*By–Rite Distributing, Inc. v. Brierly (In re By–Rite Distributing, Inc.)*, 55 B.R. 740 (D.Utah 1985) and *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 52 B.R. 850 (Bankr.D.Ill.1985)—that did not directly address when a rejection becomes effective. Rather, they focused on whether a motion for approval of assumption, which under § 365(d)(4) must be filed within sixty days of the petition filing, must also be approved within that period to be effective—a question not raised here. *By–Rite*, 55 B.R. at 741; *Bon Ton*, 52 B.R. at 853. In short, their comments regarding rejection effectiveness were, and are, dicta. *See Swiss Hot Dog*, 72 B.R. at 573 (referring to *By–Rite* and *Bon Ton* discussion as dicta); *Revco*, 109 B.R. at 270 (drawing same distinction). Notably, many courts have expressly and pointedly criticized *1 Potato* in the years since it was decided. *See Worths Stores*, 130 B.R. at 530–31; *Revco*, 109 B.R. at 270; *see also Swiss Hot Dog*, 72 B.R. at 573.

A more recent case, *In re Joseph C. Spiess Co.*, 145 B.R. 597, also supports Harris, but it suffers from numerous analytical weaknesses. For example, the court, without citation to any authority, held that § 365(a) "treats court approval not as a condition precedent to an effective assumption or rejection, but rather as a safeguard subjecting the decision of the trustee (and its business judgment) to review and possible reversal." *Spiess*, 145 B.R. at 601. This reading of the statute

not only has been rejected by most courts, *see Tobago Bay Trading*, 142 B.R. at 532 (and cases cited), it assumes that the time gap between a debtor's communication of rejection and eventual court approval will be quite "small"—presumably only a few days. *See Spiess*, 145 B.R. at 605–06. The gap is this case—four months, due in part to extensions of time—could hardly be considered small, so *Spiess*'s assumption is questionable.

*Spiess* also stated that under pre–1984 law, "court approval occurring subsequent to any assumption or rejection related back to the date of the decision," and held that nothing in the 1984 Bankruptcy Amendments changed this. *Id.* at 601–02. However, the cases cited to bolster this statement—*In re Price Chopper Supermarkets, Inc.*, 19 B.R. 462 (Bankr.S.D.Cal.1982) and *In re Avery Arnold Construction, Inc.*, 11 B.R. 34 (Bankr.S.D.Fla.1981)—are weak support, at best.[7] Moreover, the 1984 Amendments actually *did* change the law—at least enough to alter the way *Price Chopper* would turn out today.[8] *Spiess* similarly rejected *Revco*'s conclusion that Bankruptcy Rules 6006 and 9014 show an intent to strengthen the bankruptcy court's role in lease rejections, holding instead that the rules *reduced* its role "from participant to that of protector." This conclusion was based on a reading of former Bankruptcy Rule 607; properly read, however, that rule cuts directly against *Spiess*, because it provided that *"[w]henever practicable,* the trustee shall obtain approval of the court before he assumes a contract." Title I Bankr.Rule 607 (repealed) (emphasis added). Under current law, however, court approval of assumptions and rejections (unless § 365(d)(4) is in play) is mandatory, not

**7.** In *Avery Arnold,* the court held that a chapter 7 debtor-in-possession assumed a lease within the sixty-day period of former § 365(d)(1) (akin to current § 365(d)(4)) by orally conveying its intent to the lessor. *Avery Arnold,* 11 B.R. at 35. However, the court did not expressly hold that its "mandatory" approval, which came after the sixty-day period, related back to the date of the communication. Moreover, the court's favorable treatment of an oral assumption—a critical point in the *Spiess* court's analysis—has been rejected by another bankruptcy court in the Northern District of Illinois, where *Spiess* was

decided. *See In re Del Grosso,* 115 B.R. 136, 138–39 (Bankr.N.D.Ill.1990) (Squires, J.).

**8.** *Price Chopper's* holding—that a rejection related back to the date immediately before the bankruptcy filing, *Price Chopper,* 19 B.R. at 467—would not stand under current § 365(d)(3), which requires the debtor-in-possession to timely perform all post-petition, pre-rejection obligations of the debtor. *See generally In re Cardian Mortgage Corp.*, 127 B.R. 14, 15 & n. 2 (Bankr.E.D.Va.1991).

merely suggested, *see Revco*, 109 B.R. at 268, and even the *Spiess* court acknowledged this. *See Spiess*, 145 B.R. at 601–02. It therefore appears that bankruptcy court involvement in the rejection process is actually greater now than it was under Rule 607. *See generally Federated Stores*, 131 B.R. at 815; *Swiss Hot Dog*, 72 B.R. at 572.

Finally, the *Spiess* court found it "difficult to fathom" that Congress would grant a lessor the ability to collect rental payments until a rejection is approved, particularly when the debtor has abandoned the premises, simply by virtue of its status as lessor. *Spiess*, 145 B.R. at 602–03. However, this is precisely what Congress has done:

> At first glance, it may seem unfair and contrary to the bankruptcy policy of maximization of the estate's value to impose liability for abandoned leaseholds. The lessor, however, is in the unique position among bankruptcy creditors of being forced to extend credit by allowing the use of its property during the period after the commencement of the case but before formal rejection of the lease with the possibility of getting little or no compensation in return if it is rejected. The distinction between lessors and other creditors becomes more apparent upon consideration that the land likely continues to accrue mortgage, tax, maintenance, insurance, and other obligations that the lessor still must pay.

*In re Cardian Mortgage Corp.*, 127 B.R. 14, 15–16 (Bankr.E.D.Va.1991); *see also In re CSVA, Inc.*, 140 B.R. 116, 120–21 (Bankr.W.D.N.C.1992).

### 3. *Fairness Considerations*

Harris acknowledges that its interpretation of § 365(a) might subject lessors to a risk of injury, as envisioned by the bankruptcy court. *See* Entry at 5–6. It contends, however, that this risk is "largely hypothetical," because almost all rejection decisions are approved, and "commercial real estate is not normally re-let in a day." By contrast, delaying rejection effectiveness until court approval will routinely cause "inevitable injury" to debtors in Harris's position, because they will be forced to "waste precious assets to pay rent for ... empty store[s]." In simple terms, Harris claims that Salter's approach is more unfair to debtors than Harris's approach is to lessors.

This argument warrants three responses. First, Harris's interpretation of the statute, if adopted, might result in only a small risk of injury to lessors, but that risk would be quite real. Courts can, and do, differ with debtors-in-possession over the value of leases or executory contracts, and they override rejection decisions on this basis. *See, e.g., In re Midwest Polychem, Ltd.*, 61 B.R. 559 (Bankr.N.D.Ill.1986) (refusing to approve rejection of executory contract). Second, the fact that a debtor-in-possession can reject a lease does not mean that the estate will escape its obligations free of injury. As already noted, the debtor "bear[s] the risk that the court may not reach a decision as quickly as the [debtor] expect[s] or desire[s]." *Federated Stores*, 131 B.R. at 815. Finally, the debtor's risk of loss is clearly limited by statute. Section 365(d)(4) provides that a lease will be rejected by operation of law sixty days after filing of the bankruptcy petition, if the lease is not explicitly assumed or rejected within that period. As a result, the debtor cannot be saddled with more than sixty days' worth of post-petition rent on a rejected lease, unless it moves for and receives an enlargement of time, as Harris did here. *See Arizona Appetito's*, 893 F.2d at 219 (lease deemed rejected after sixty-day period where trustee filed motion for approval of rejection); *see also Virginia Packaging*, 122 B.R. at 493; *National Oil*, 80 B.R. at 526.[9]

In sum, the statute's plain language, the better-reasoned case law, and considerations of fairness all support a conclusion

---

**9.** At least one court appears to have missed this limitation. In *Four Star Pizza*, the court held that the lease rejection was not effective until the date of court approval, even though the sixty-day cutoff of § 365(d)(4) had already passed by this time. *See Four Star Pizza*, 135 B.R. at 501. While *Four Star* is correct in all other aspects, this part of the holding is clearly wrong in light of *Arizona Appetito's* and *Virginia Packaging*.

that the rejection of a lease under § 365 is effective only after approval by the bankruptcy court pursuant to § 365(a), or lapse of the statutory sixty-day period under § 365(d)(4), instead of when an act of rejection is first taken. The bankruptcy court approved Harris's rejection of the Boylston Street lease on August 19, 1991; Harris therefore is liable for rent through that date.

### B. Amount of Rent Recoverable

■ With Harris's liability for post-petition rent established, the focus shifts to determining how much it must pay. Post-petition rent generally qualifies for administrative expense treatment under the Bankruptcy Code, giving it certain priority over other claims against the estate. 11 U.S.C. § 507(a)(1). As a rule, expenses are considered administrative only to the extent that they represent "actual, necessary costs and expenses of preserving the estate," and are sought in compliance with procedural requirements such as notice and hearing. 11 U.S.C. § 503(b)(1); *see also Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859, 871 (7th Cir. 1989) (expenditures must benefit the estate as a whole).

Section 365(d)(3) slightly complicates the administrative expense formula for post-petition rent, however. That section provides that a debtor-in-possession "shall timely perform all the obligations of the debtor . . . arising from and after the order of relief under any unexpired lease of non-residential real property, until such lease is assumed or rejected, *notwithstanding section 503(b)(1) of this title.*" 11 U.S.C. § 365(d)(3) (emphasis added). Consequently, § 365(d)(3) confers administrative status on post-petition, pre-lease rejection rent, and simultaneously limits the application of § 503(b)(1) to claims for such rent.

Harris and Salter agree on this, but disagree on what limits § 365(d)(3) actually imposes. Harris argues that "notwithstanding section 503(b)(1)" has a fairly narrow meaning. Specifically, it contends that the language does not relieve a lessor from establishing post-petition, pre-rejection rent as an "actual, necessary" expense; rather, Harris claims that the phrase merely requires a court to order payment of rent, regardless of its administrative or non-administrative status, for the period preceding rejection. Salter reads the language more broadly, arguing that § 365(d)(3) allows the full administrative recovery of post-petition, pre-rejection rent according to lease terms, without regard to whether it benefits the estate.

The statute may be read both ways, but Salter's interpretation is supported by an overwhelming majority of the case law. The Court is aware of six reported cases with facts almost identical to those here (i.e., the debtor vacated premises entirely, rejected the lease, and gained court approval). In all but one, lessors were awarded post-petition, pre-rejection rent according to terms of the lease, and factors such as fair market value, extent of occupation, and benefit to the estate were considered irrelevant in computing the amounts owed. *Spiess,* 145 B.R. at 606–07; *Tobago Bay Trading,* 142 B.R. at 533; *Matter of Laurence R. Smith, Inc.,* 127 B.R. 715, 716–17 (Bankr.D.Conn.1991); *Cardian Mortgage,* 127 B.R. at 16; *Revco,* 109 B.R. at 270–71. *But see In re Daisy/Cadnetix Inc.,* 126 B.R. 87 (Bankr.N.D.Cal.1991).[10]

---

**10.** Three other courts, in cases where the debtor vacated the premises partially rather than completely, reached the same conclusion. *Four Star Pizza,* 135 B.R. at 500; *Virginia Packaging,* 122 B.R. at 494; *In re Cardinal Indus., Inc.,* 109 B.R. 738, 740–41 (Bankr.S.D.Ohio 1989). Numerous other cases are in accord. *See, e.g., In re U.S. Fax, Inc.,* 114 B.R. 70, 73–74 (E.D.Pa.1990); *In re Rare Coin Galleries of America, Inc.,* 72 B.R. 415, 416 (D.Mass.1987); *Second Pennsylvania Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.),* 126 B.R. 926, 929 (Bankr. W.D.Pa.1991); *In re Washington Bancorporation,* 125 B.R. 328, 329 (Bankr.D.D.C.1991);

*Meritbanc Sav. Ass'n v. Regency Chevrolet, Inc. (In re Regency Chevrolet, Inc.),* 122 B.R. 60, 62 (Bankr.S.D.Tex.1990); *In re Narragansett Clothing Co.,* 119 B.R. 388, 391 (Bankr.D.R.I.1990); *In re Wingspread Corp.,* 116 B.R. 915, 925–26 (Bankr.S.D.N.Y.1990); *In re Western Monetary Consultants,* 100 B.R. 545, 547 (Bankr.D.Colo. 1989); *In re Gillis,* 92 B.R. 461, 465 (Bankr. D.Haw.1988); *In re D'Lites of America, Inc.,* 86 B.R. 299, 301 n. 1 (Bankr.N.D.Ga.1988); *National Oil,* 80 B.R. at 527; *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969, 972 (Bankr. E.D.Pa.1987); *In re Coastal Dry Dock & Repair*

Harris relies primarily on *Great Western Savings Bank v. Orvco, Inc. (In re Orvco, Inc.),* 95 B.R. 724 (9th Cir.BAP 1989), which formed the basis for decision in *Daisy/Cadnetix,* 126 B.R. at 87, to support its argument. In *Orvco,* the debtor's lease for certain property was deemed rejected, due to its failure to assume or reject within § 365(d)(4)'s sixty-day period. The lessor sought rent for these sixty days at the full lease rate, arguing that § 365(d)(3) eliminates any need for compliance with § 503(b)(1). The court, despite noting the line of cases cited above, rejected this argument:

> Nothing in the language of [section 365(d)(3)] requires administrative ... status. In our view, the language of [section] 365(d)(3), "notwithstanding section 503(b)(1)," means that notwithstanding the administrative or non-administrative status of a claim by the lessor, a bankruptcy court must order its payment pending assumption or rejection. It does not mean that the necessity for showing the reasonableness of the rent or any of the other factors considered under section 503(b)(1)(A) has been completely abrogated. Accordingly, we hold that when a lease is deemed rejected, a lessor must establish its claim for administrative status under section 503(b)(1)(A), the specific section governing such status.

*Orvco,* 95 B.R. at 727–28; *see also Daisy/Cadnetix,* 126 B.R. at 90–91 (following *Orvco* ); *In re Tammey Jewels, Inc.,* 116 B.R. 292, 294 (Bankr.M.D.Fla.1990) (same).

*Orvco* fails to convince. Initially, its narrow reading of § 365(d)(3) has been rejected by court after court as contrary to the statute's plain meaning. *See, e.g., Smith,* 127 B.R. at 716; *Tobago Bay Trading,* 142 B.R. at 533; *Revco,* 109 B.R. at 270; *In re Granada, Inc.,* 88 B.R. 369, 372 (Bankr. D.Utah); *see also In re Wingspread Corp.,* 116 B.R. 915, 925–26 (Bankr.S.D.N.Y.1990). Moreover, *Orvco*'s interpretation "flout[s] the intent of Congress," *Wingspread,* 116 B.R. at 926, which was for § 365(d)(3) to "realign the burdens" incident to assumption and rejection of leases for nonresiden-

*Corp.,* 62 B.R. 879, 882–83 (Bankr.E.D.N.Y. 1986); *Matter of Longua,* 58 B.R. 503, 504–05

tial real property. *Granada,* 88 B.R. at 371 (citation omitted). This intent is evident in the comments of Senator Orrin Hatch, a sponsor of § 365(d)(3), who noted the hardships lessors face between petition filing and lease rejection:

> In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position.
>
> \* \* \* \* \* \*
>
> The bill would lessen these problems by requiring the [debtor-in-possession] to perform *all the obligations* of the debtor under a lease of nonresidential property *at the time required in the lease.* This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time *pending trustee's assumption or rejection of the lease.*

130 Cong.Rec. S8894–95 (daily ed. June 29, 1984) (remarks of Sen. Hatch), *reprinted in* 1984 U.S.C.C.A.N. 590, 599 (emphasis added); *see also In re U.S. Fax, Inc.,* 114 B.R. 70, 73 (E.D.Pa.1990) (discussing legislative intent); *Cardian Mortgage,* 127 B.R. at 15–16 (same); *Matter of Longua,* 58 B.R. 503, 505 & n. 1 (Bankr.W.D.Wis.1986) (same). *Orvco* therefore must be rejected.

In light of all the authority, the Court concludes that § 365(d)(3) was designed to provide lessors with "a claim under the lease that runs until rejection of the lease," which happens only upon formal court approval or by operation of law under § 364(d)(4). *Cardian Mortgage,* 127 B.R. at 16. Harris therefore must pay the full amount of rent due under its lease with Salter through August 19, 1991.

### III. CONCLUSION

For the reasons discussed, the decision of the bankruptcy court is AFFIRMED.

SO ORDERED.